IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MICHAEL P. OPELA, SR.,

               Plaintiff,

    v.

APOGEE WAUSAU GROUP, INC.,
d/b/a WAUSAU WINDOW AND WALL
SYSTEMS,

               Defendant.

OPINION AND ORDER

17-cv-124-wmc

In this lawsuit, plaintiff Michael P. Opela, Sr., asserts a claim for violation of the whistleblowing protections contained in the Consumer Product Safety Improvement Act ("CPSIA"), 15 U.S.C. § 2087, against his former employer Apogee Wausau Group, Inc., d/b/a Wausau Window and Wall Systems ("Wausau"). More specifically, Opela contends that Wausau terminated him because he complained about potentially defective manufacturing materials used in Wausau's products. Before the court is defendant's motion for summary judgment. (Dkt. #20.) Based on the parties' submissions, the court will deny that motion, finding sufficient evidence from which a reasonable jury could conclude both that (1) "consumer products" are at issue and (2) Opela's complaints were at least a contributing factor in Wausau's decision to terminate his employment. As to the burden-shifting prong of Opela's claim, the court further concludes that the evidence of Wausau's purported reason for terminating Opela's employment is not so one-sided as to warrant entry of judgment in defendant's favor.

## UNDISPUTED FACTS[1]

### A. Background

Defendant Wausau produces building components, including aluminum window and curtain-wall systems. Plaintiff Michael P. Opela was employed by Wausau to manage its Structural Engineering Department from December 30, 2013, to September 25, 2014, the date he was fired.

Before his employment with Wausau, Opela worked for Forensic Building Science ("FBS"), from approximately January 2010 to May 2011, as the Director of Forensic Inspections. Opela was introduced to FBS through his own company, Opela Worx Structural Engineers, Inc., which he owned and had been operating since September 2004. According to Opela, the intent behind his employment by FBS was to facilitate his eventual purchase of the company, but that never came to fruition. During his deposition, Opela described his departure from FBS as "tenuous" and "adversarial."[2]

### B. Opela's Hiring by Wausau

In 2013, Wausau worked with a third-party company, Management Recruiters of St. Croix Valley, to identify and recruit viable candidates for its open "Structural Engineering Manager" position. Opela learned of the opening from Management

---

[1] The court finds the following facts undisputed and material when viewed in a light most favorable to plaintiff as the non-moving party, unless otherwise noted.

[2] It is not clear what Opela meant by "tenuous," which means "having little substance or strength" or "shaky." "Tenuous," Merriam-Webster, https://www.merriam-webster.com/dictionary/tenuous. Regardless, it is undisputed that Opela's departure was "not amicable." (Def.'s PFOFs (dkt. #22) ¶ 14.)

Recruiters' Account Manager Aaron Keopple. After identifying Opela as a potential candidate, Management Recruiters worked with him during the application and recruitment process.

At the direction of Keopple, Opela provided Management Recruiters a copy of his resume on August 6, 2013, which defendant maintains did not disclose his nine-month employment by FBS.[3] However, the parties dispute whether the copy Opela produced during discovery was the resume he actually submitted to Management Recruiters. (Def.'s Reply to Def.'s PFOFs (dkt. #43) ¶ 18 (discussing Hontos Decl., Ex. 1 (dkt. #26-1)).) In particular, Opela contends that he did, however, submit a resume to Management Recruiters listing his work at FBS, and that Management Recruiters provided him a copy of two resumes both identifying FBS as a previous employer. (Pl.'s Add'l PFOFs (dkt. #36) ¶¶ 10-11.)

Even so, there is no dispute that the resume Management Recruiters transmitted to Wausau as part of the recruitment process did not include plaintiff's employment at FBS, which Opela explains was consistent with Keopple telling him that Wausau wanted a resume from Opela containing only experience relevant to the Structural Engineering Manager position. In reviewing his resume, Opela further acknowledges that *he* determined his position with FBS was not applicable to the Structural Engineering Manager position. As such, Opela effectively acknowledged that he participated in the decision to remove his then current employment with FBS from his resume, although Opela also maintains that

---

[3] Management Recruiters also submitted a "Candidate Summary" on Opela's behalf to Wausau, which Opela avers he did not see before it was submitted.

3

he later disclosed his employment at FBS in completing an online questionnaire for Management Recruiters, specifically stating that he left that position because "the owner hired me on the intent of selling the business to me and I came to realize that he would never sell." (Pl.'s Add'l PFOFs (dkt. #36) ¶ 17 (citing Opela Decl., Ex. 2 (dkt. #37-2)).)

In September 2013, plaintiff participated in a series of telephone and in-person interviews with Wausau personnel. Defendant contends that Opela did not disclose his prior employment with FBS during these interviews. Opela disputes this, averring that he specifically disclosed his employment to Laura Johnson, Senior Human Resources Generalist, during his telephone interview with her on or about September 11, 2013. Opela avers that his employment with FBS came up when Johnson inquired about *all* of Opela's past employment, not just that relevant to the Wausau position. Opela further avers that Johnson inquired about whether he had an *existing* non-compete agreement, to which he responded that his agreement with FBS had expired. Opela also represents that he informed Gene Pagel, Wausau's Vice President of Engineering, and Steve Fronek, its Vice President of Design Engineering, during his telephone interview with them in mid-September, and he again disclosed his employment to Pagel and Fronek, as well as to Peter Fuchs, John Rauman, Jeremy Harger and Jim Edyean, during on-site interviews in mid-September. (Pl.'s Resp. to Def.'s PFOFs (dkt. #25) ¶ 21 (citing Opela Decl. (dkt. #37) ¶¶ 12-15; Opela Depo. (dkt. #27) 218-19).)

In further support of his having informed interviewers of previous FBS employment, Opela points to Fronek's interview notes, listing "Forensic" investigation experience. (Pl.'s Add'l PFOFs (dkt. #36) ¶ 31 (citing Egan Decl., Ex. 7 (dkt. #24-7)).) Furthermore,

4

Rauman testified at his deposition that he recalled Opela discussing his past employment experience conducting forensic investigations during the interview. (*Id.* at ¶ 32 (citing Rauman Depo. (dkt. #39) 16-17).)[4]

On October 4, 2013, Pagel authorized Johnson to extend Opela an offer of employment, contingent on his execution of a non-compete agreement and successful background check. In response, Opela indicated that he wanted to incorporate an addendum to the Wausau non-compete, and on October 9, Keopple sent a one-page document to Johnson that Opela had requested be incorporated into the non-compete agreement. This one-page document had the following fax address heading:

```
JUL-28-2011 15:35 From:FBS          6515286237          To:18006351518          Page:21/24
```

(Egan Decl., Ex. 3 (dkt. #24-3) 4 (noting "From: FBS" in apparent facsimile transmission) (emphasis added).) Defendant reasonably argues, however, that this heading would not place it on notice of Opela's former employment with FBS.

On or about October 24, 2013, Wausau made a revised offer of employment, which Opela accepted. His first day of work was on or about December 30, 2013. Opela reported directly to Pagel.

---

[4] Opela also represents that after he began his employment with Wausau, he disclosed his work experience with FBS "to anyone and everyone who asked about his past employment positions, and at no time did anyone indicate that it was a problem." (Pl.'s Add'l PFOFs (dkt. #36) ¶¶ 35-36, 46 (citing Opela Decl. (dkt. #37) ¶¶ 11, 16).) In particular, Opela avers that he discussed his employment with FBS in conversations with Fronek, relating to malfunctions or under-performing products. (*Id.* at ¶¶ 47-48 (citing Opela Decl. (dkt. #37) ¶ 17).)

### C. Opela Voices Concerns

In early 2014, shortly after his hiring, Opela began reviewing the process by which Wausau tested or specified the strength of the materials it received for incorporation into its products. Opela discovered that Wausau had no processes in place to verify that it was receiving materials that complied with required specifications and OSHA regulations. This review or investigation continued over the course of that year. In August or September 2014, Rayna Bancyk, a Wausau engineer, also approached Opela with concerns regarding material strengths of certain alloys on a Wausau project. Opela was particularly concerned about this information, because the materials were used in products that had been installed in existing structures, including blast windows in government buildings that were required to meet applicable strength specifications and regulations.[5] Opela also investigated installation concerns relating to Wausau's window washer anchor bolts, as well as connection concerns related to security windows in psychiatric buildings.

Opela's investigation culminated in a number of meetings in August and September 2014. Opela had a number of meetings with Wausau's engineering managers to discuss his concerns about Wausau's materials. Opela also met with Michael Weis, Wausau's Vice President of Continuous Improvement, on or about September 20, 2014, and "informed him of his discovery that Wausau had been using non-compliant materials in its products which resulted in a real and substantial risk of injury or death to the consumer and public." (Pl.'s Add'l PFOFs (dkt. #36) ¶ 49 (citing Opela Decl. (dkt. #37) ¶ 19).) Opela further

---

[5] Defendant points out that Bancyk has "not been terminated, disciplined or retaliated against in any manner for raising her concerns." (Def.'s PFOFs (dkt. #22) ¶ 32.)

spoke with John Waldron, President of Wausau, in mid-September; and he spoke to Design Engineer Vice President Fronek around this time as well. Following the latter, Fronek specifically directed Opela not to contact any outside agencies regarding the information shared during their meeting. Finally, just before his termination, Opela had begun working with Brad Fehl, another Wausau employee, to find a third-party company to test the non-compliant materials.

### D. Opela's Termination

Wausau's Engineering Vice President Pagel avers in his declaration that in September 2014, an Engineering Associate -- who he identified during his deposition as John Rauman -- informed him that "there was information on the internet regarding Plaintiff [Opela]'s prior employment with and termination from FBS, and that he had not passed the Minnesota Professional Engineering examination." (Pagel Decl. (dkt. #25) ¶ 12.) However, plaintiff points out that during his deposition, Rauman testified that he did *not* bring this to Pagel's attention; instead, Rauman recalled that at the time of their discussion about Opela's prior employment, *Pagel* already knew about Opela's employment with FBS *and* knew Opela had not passed the MPE exam. (Pl.'s Resp. to Def.'s PFOFs (dkt. #35) ¶ 34 (citing Rauman Depo. (dkt. #39) 30-31).)

Regardless of how he learned, Pagel asked then Vice President of Human Resources, Maureen Egan, to investigate the allegations sometime after speaking to Rauman. Egan's investigation included an internet search, in which she discovered two legal proceedings arising out of plaintiff's employment with FBS. (Egan Decl., Exs. 5, 6 (dkt. ##24-5, 24-6).) Egan also reviewed Opela's personal file, and she spoke to some of the Wausau

7

employees who had interviewed him, although Egan did not interview Jeremy Harger or Jim Edyean regarding their knowledge of Opela's past employment with FBS. Egan represents that "[n]either the file nor these conversations indicated that Plaintiff had disclosed his employment with FBS." (Egan Decl. (dkt. #24) ¶ 17.)

On September 24, 2014, Egan interviewed Opela. During the interview, Egan maintains that Opela told her that he had been employed by FBS for more than one year, but did not disclose this information because it "didn't end well." (Def.'s PFOFs (dkt. #22) ¶¶ 40-41 (citing Egan Decl. (dkt. #24) ¶ 18; *id.*, Ex. 4 (dkt. #24-4)).) Opela disputes this account. Instead, he remembers telling Egan both: (1) that he had been employed by FBS for more than one year; and (2) that he disclosed this prior employment *during the interview process* to Johnson, Pagel, Rauman, Harger, Edyean and Fuchs. (Pl.'s Resp. to Def.'s PFOFs (dkt. #35) ¶ 40 (citing Opela Decl. (dkt. #37) ¶ 23).) Opela also avers that he told Egan that he had not included this employment on his resume because it was not relevant experience; and he also pointed out to Egan that he was the one who sent Wausau an FBS the non-compete agreement addendum form through Management Recruiters. (Pl's Add'l PFOFs (dkt. #36) ¶ 73 (citing Opela Decl. (dkt. #37) ¶ 23).)

Still, as a result of her investigation, Egan concluded that Opela had not disclosed his prior employment with FBS.[6] Defendant further maintains that honesty and integrity are important principles at Wausau, as reflected in its Core Values policy, 2014 Code of Conduct Guide, and a statement on its hiring process in the Associate Handbook. The

---

[6] Opela disputes her conclusion and argues that her investigation was a "sham." (Pl.'s Resp. to Def.'s PFOFs (dkt. #35) ¶ 54.)

latter specifically states that "[a]n unjustified refusal to supply requested information or a significant or material falsification of information supplied during the hiring process will result in elimination of the individual from consideration, or, if discovered after employed, will result in termination of employment." (Def.'s PFOFs (dkt. #22) ¶ 44 (citing Egan Decl., Ex. 11 (dkt. #24-11)).) Defendant further points to Wausau's Disclosure and Authority to Release Information Form, which plaintiff signed during the hiring process, acknowledging "if any statements and/or answers are found false or the information has been omitted, such false statements or omissions may be cause for rejection or termination of my employment or application." (*Id.* at ¶ 46 (citing Egan Decl., Ex. 13 (dkt. #24-13)).) Finally, defendant represents that Wausau has previously rescinded job offers from otherwise qualified candidates for violations of these policies during the hiring process. (*Id.* at ¶¶ 49-51 (describing example of rescinding an offer).)

On September 25, 2014, Egan and Pagel met to discuss the results of her investigation. Based on Opela omitting FBS from his resume and "intentionally" withholding that same information during the hiring process, Pagel made the decision to terminate Opela's employment for violations of company policies. Wausau terminated Opela's employment that same day. (Egan Decl., Ex. 9 (dkt. #24-9).)

Opela appealed his termination to Wausau's parent company, Apogee Enterprises, Inc. During that appeal, Opela was told by Warran Planitzer, Apogee's Vice President of Human Resources, that Wausau confirmed Opela had disclosed his employment at FBS during the recruitment process. Nevertheless, Apogee declined to reverse Opela's firing.[7]

---

[7] Defendant also proposes a number of factual findings concerning Wausau's sales, which are

OPINION

In a prior opinion and order, the court dismissed most of plaintiff's claims and all defendants except for Opela's sole remaining claim that defendant Wausau violated the whistleblower protections contained in CPSIA, 15 U.S.C. § 2087, by terminating his employment. In its motion for summary judgment, defendant seeks judgment in its favor, asserting three independent bases: (1) plaintiff's CPSIA claim does not concern a "consumer product" as required under that statute; (2) plaintiff has failed to establish a *prima facie* case of retaliation; and (3) Wausau would have terminated Opela even in the absence of any protected activity. The court addresses these arguments below.

**I. Consumer Products Requirement**

The protections of the whistleblower provision of CPSIA, 15 U.S.C. § 2087, are limited to defendants making or distributing "consumer products." The statute defines a consumer product as

> any article, or component part thereof, produced or distributed (i) for sale to a consumer for use in or around a permanent or temporary household or residence, a school, in recreation, or otherwise, or (ii) for the personal use, consumption or enjoyment of a consumer in or around a permanent or temporary household or residence, a school, in recreation, or otherwise. . . .

15 U.S.C. § 2052(a)(5). The statute also carves out various exceptions, one of which defendant claims is applicable here: excluding from the statute's reach "any article which is not customarily produced or distributed for sale to, or use or consumption by, or

---

relevant to whether it makes or distributes "consumer products," but the court will detail those facts as appropriate in the opinion below.

enjoyment of, a consumer." 15 U.S.C § 2052(a)(5)(A).

In its opinion and order on defendants' motion to dismiss, the court reviewed the statutory text, legislative history, advisory opinions from the Consumer Product Safety Commission and other cases to determine the meaning of "consumer product," arriving at four guideposts:

1) While the statute does not define the word "consumer," it should be interpreted broadly to mean the public generally. (8/31/17 Op. & Order (dkt. #17) 20.)

2) The term is not intended to cover "true industrial products" (e.g., a lawn mower used exclusively on industrial farms or an industrial aerial basket), but the fact that a product is exclusively sold to industrial or institutional buyers does not render it a "true industrial product." (*Id.* at 21.)

3) To qualify as a "consumer product," the item must be a "distinct article," but that term covers items incorporated into residential structures. (*Id.* at 21-23.)

4) The distribution of products almost exclusively to contractors and subcontractors may implicate the exception described above, 15 U.S.C. § 2052(a)(5)(A). (*Id.* at 24.)

Based on these guideposts and plaintiff's allegations, the court then concluded that "[c]onstruing all reasonable inferences in plaintiff's favor, the window frames, bolts and curtain wall products produced by Wausau qualify as consumer products as defined under 15 U.S.C. § 2052(a)(5)" (*id.* at 25), leaving it up to plaintiff as the party with the burden of proof as to this element to gather evidence in support of a factual finding that Wausau manufactures or distributes consumer products. In his opposition to defendant's motion

for summary judgment on this basis, however, plaintiff assumes erroneously that this element was fully resolved at the motion to dismiss stage. (Pl.'s Opp'n (dkt. #34) 20 ("Here, Defendants are attempting to re-litigate an issue that this Court has already ruled upon in this case.").) It was not.[8]

In support of its motion for summary judgment, defendant submitted a declaration by its Vice President of Design Engineering, Steve Fronek. Fronek represents that "Wausau sells its finished products exclusively to developers, contractors, and sub-contractors." (Fronek Decl. (dkt. #23) ¶ 7.) As for any sales to individuals, Fronek further avers that those sales are "limited to replacement hardware or other miscellaneous components," and that it only "completes one or two such orders per year, amounting to a few hundred dollars in sales." (*Id.*) In Fronek's review of 18-years of order information, he discovered 72 orders "related to residences--an average of only four per year," as compared to "hundreds of large-scale commercial and institutional project orders," and that of those 72 orders, "Wausau sold zero orders directly to homeowners or condo-unit owners." (*Id.* at ¶ 8.) Fronek further avers that Wausau does not "sell its products to consumers directly, nor through distributors or in retail 'big box' stores." (*Id.* at ¶ 10.) As for advertising, Fronek also represents that "Wausau conducts no marketing directly to 'do-it-yourself' consumers or end-users"; instead, it markets products to "design teams . . ., subcontractors and general contractors or construction managers," and its limited

---

[8] In fairness to plaintiff, there is one exception with respect to the court's treatment of the "distinct articles" requirement, but defendant (apparently noting this) does not argue in its motion for summary judgment that its products are not "distinct articles." Instead, defendant appropriately focuses on who buys its products and how they are used.

advertising is "done exclusively in industry trade press, not in publications targeted at the general public. (*Id.* at ¶¶ 11-12.)

In response, plaintiff focuses on Fronek's reference to some isolated sales to individuals or for use in residences, and citing only to the complaint, states that "Defendant[']s products are used on residences, schools, hospitals, condominiums, government structures, and private buildings. (Complaint at ¶ 14)." (Pl.'s Opp'n (dkt. #34) 21.) While plaintiff's response is lacking, the court nonetheless finds that Fronek's declaration does not *foreclose* a finding in plaintiff's favor. Instead, his declaration supports: (1) some isolated sales to individuals; (2) some use of the materials in residences; and (3) perhaps most importantly, broader use of the products in other commercial and institutional buildings, which gives rise to a reasonable inference that the public may encounter Wausau's products in those settings.

The court, therefore, declines to enter summary judgment on this limited record. Still, from the court's view, this seems like an unusual issue for a jury's review since there should not be any *factual* disputes as to the sale, use, consumption or enjoyment of defendant's products. Accordingly, at the telephonic conference on May 24, 2018, scheduled in the order below, the parties should be prepared to make factual proffers on this issue to determine if this is really an issue of law for the court to decide.

## II. *Prima Facie* Case

There are few cases describing a retaliation claim under CPSIA's whistleblower protections. In its motion, defendant describes the elements necessary to set forth a *prima facie* claim of retaliation under the Sarbanes-Oxley Act's whistleblower protection:

13

> (1) [plaintiff] engaged in protected activity; (2) the employer knew that [plaintiff] engaged in the protected activity; (3) [plaintiff] suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action.

*Hill v. Komatsu Am. Corp.*, No. 14-CV-02098, 2015 WL 5162129, at *4 (N.D. Ill. Aug. 26, 2015). Plaintiff does not dispute that these are the necessary elements.[9] Accordingly, the court will apply these four elements in determining if plaintiff has met his burden of producing evidence to demonstrate a CPSIA whistleblower claim. Moreover, since defendant does not dispute, at least for summary judgment purposes, that plaintiff satisfies the first three elements, the entire focus of the pending motion is on the fourth element -- that the protected activity was a contributing factor in plaintiff's termination.

Here, defendant argues that there is no evidence to support plaintiff's claim, arguing instead that "*all* of the available evidence [demonstrates that] Wausau terminated Plaintiff's employment because it believed he had exhibited dishonesty in the hiring process, omitting from his resume his FBS employment and violating company policies in the process." (Def.'s Br. (dkt. #21) 18.) While defendant has a paper trail supporting the purported reason for Opela's firing, this does not foreclose a finding that Wausau was motivated by Opela's voicing protected concerns in terminating his employment, or at least that his concerns motivated Wausau to investigate Opela's background and any omissions

---

[9] The parties' consensus is hardly surprising since these elements mirror those in an administrative regulation describing the pleading requirements of a CPSIA whistleblower claim. 29 C.F.R. § 1983.104. These four elements are also consistent with retaliation claims brought under other whistleblower protection statutes. *See, e.g., Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 479 (7th Cir. 2004) (describing similar elements of *prima facie* claim under False Claims Act, 31 U.S.C. § 3730(h)); *Kahn v. U.S. Sec'y of Labor*, 64 F.3d 271, 277 (7th Cir. 1995), *as modified* (Sept. 7, 1995) (describing similar *prima facie* elements for proving a "whistleblower" retaliation claim under the Energy Reorganization Act of 1974, § 211, as amended, 42 U.S.C. § 5851).

from his application.  Defendant would appear to suggest that direct evidence of causation is required for plaintiff to move forward to trial, but in a retaliation claim, such evidence is rarely available.

Here, the evidence demonstrates that Opela's concerns about product quality came to a head in August and September 2014, after which he had a series of meetings with high-level individuals in the corporation, including Wausau's President, about his concerns that materials incorporated into Wausau's products lacked sufficient strength.  Of importance for purposes of defendant's current motion for summary judgment, these meetings were ongoing during the week or two leading up to Opela's firing.  The court recognizes that "suspicious timing alone rarely is sufficient to create a triable issue," *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006), but the very close proximity here, indeed overlapping of events, coupled with the fact that Opela was complaining to the highest level of management, *and* fact issues surrounding how and why Opela's alleged omission of his former employment came to light during this same time, forms a sufficient basis for a reasonable factfinder to conclude that this fourth element is satisfied.

Finally, the fact that another employee who assisted Opela in his investigation was not terminated or otherwise disciplined does not *foreclose* a reasonable jury from finding that Opela's protected activity motivated Wausau to terminate him, especially in light of Opela's apparent leadership role in heading this investigation and central function in voicing complaints.  Accordingly, the court will deny defendant's motion for summary judgment on this basis as well.

## III. Legitimate Reason for Termination

Finally, defendant seeks summary judgment on the burden-shifting prong of plaintiff's claim. Specifically in this case, "[i]f the employee establishes [the] four elements [described above], the employer may avoid liability if it can prove by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of that [protected] behavior." *Lamb v. Rockwell Automation, Inc.*, 249 F. Supp. 3d 904, 910 (E.D. Wis. 2017) (setting forth burden-shifting element under Sarbanes-Oxley Act); *see also* 29 C.F.R. § 1983.104 (same test under CPSIA administrative regulation). On this element, Wausau has the burden of proof "demonstrat[ing] why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Retirement Fund*, 778 F.3d 593, 601 (7th Cir. 2015). Moreover, Wausau must meet the burden with clear and convincing evidence. On summary judgment at least, defendant falls far short of this high hurdle.

In support of its argument, Wausau relies on evidence that (1) Opela omitted FBS as a former employer on his resume and (2) this omission was intentional. Wausau argues that this evidence demonstrates that Opela violated Wausau's policies about honesty and integrity, and thus, his termination was for a legitimate reason. However, plaintiff has offered sufficient evidence to raise a genuine issue of material fact as to whether: (1) Opela actually failed to disclose FBS as an employee; (2) Wausau required the disclosure, which would be necessary to find that Opela affirmatively omitted this information; and (3) the omission was intentional, implicating Wausau's policies about honesty and integrity.

As detailed above, plaintiff avers that his former employment came up in numerous

16

interviews with individuals at Wausau during the hiring process and also was mentioned in conversations during the first months of his employment. These avowals, coupled with the apparently undisputed representation by Apogee Enterprises' Vice President of Human Resources that Opela had disclosed his employment at FBS during Wausau's recruitment process, is sufficient to raise a genuine issue of material fact as to whether he failed to disclose FBS.[10]

Moreover, even if he did not disclose FBS, Opela's representation that he was not required to disclose it, having only been asked to include on his resume prior experiences relevant to the Wausau job, raises a genuine issue of material fact as to whether any omission was intentional, or, at least, whether defendant could reasonably believe that the omission was intentional, in violation of Wausau policy. All of this is to say that a jury will have to sort through these factual disputes and determine whether Wausau has met its burden of proving by clear and convincing evidence that it would have terminated Opela even if he had not engaged in protected conduct. Accordingly, the court will deny defendant's motion on this basis as well.

---

[10] Although less persuasive, plaintiff also argues that Wausau was somehow on notice by virtue of his forwarding a one-page, proposed non-compete document to Wausau with an FBS fax address at the top of the page.

ORDER

IT IS ORDERED that:

1) Defendant Apogee Wausau Group, Inc. d/b/a Wausau Window and Wall Systems' motion for summary judgment (dkt. #20) is DENIED.

2) The court will hold a telephonic conference on May 24, 2018, at 2:00 p.m. to (1) discuss the timing of this trial in light of a conflicting criminal trial also scheduled for the week of June 11, 2018; and (2) hear the parties' factual proffers on the "consumer products" element of plaintiff's claim.

Entered this 8th day of May, 2018.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge